Vitaform, Inc. v. Aeroflow, Inc., 2020 NCBC 80.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

VITAFORM, INC. (d/b/a BODY
AFTER BABY),

        Plaintiff,

v.

AEROFLOW, INC. AND MOTIF
MEDICAL, LLC,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 3707

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED
COMPLAINT**

1. This case involves allegations that a national distributor of breast pumps and maternity compression garments, Defendant Aeroflow, Inc. ("Aeroflow"), stole the products, product designs, and business plan of its manufacturer, Plaintiff Vitaform, Inc. (d/b/a Body After Baby) ("BAB" or the "Company"), enabling Aeroflow to copy, manufacture, and/or sell its own products through its wholly owned subsidiary, Defendant Motif Medical, LLC ("Motif Medical"), in direct competition with BAB. BAB contends that its maternity compression garment business has suffered substantial injury as a result of Defendants' misconduct, including the loss of its strategic position as first to market with certain highly profitable products.

2. The matter before the Court for decision is Defendants' Motion to Dismiss Amended Complaint Under Rule 12(b)(6) filed January 9, 2020 (the "Motion") in the above-captioned case. (ECF No. 42.)

3.     Having considered the Motion, the related briefing, and the arguments of counsel at the hearing on the Motion, the Court hereby **GRANTS in part** and **DENIES in part** the Motion as set forth below.

> *Smith DeVoss, PLLC, by Jeffrey J. Smith and John R. DeVoss, and Wimer & Snider, P.C., by Jake A. Snider and Michael G. Wimer, for Plaintiff Vitaform, Inc. (d/b/a Body After Baby).*
>
> *Ward and Smith, P.A., by Joseph A. Schouten and Haley R. Wells, for Defendants Aeroflow, Inc. and Motif Medical, LLC.*

Bledsoe, Chief Judge.

I.

FACTUAL & PROCEDURAL BACKGROUND

4.     The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)") but recites only those facts included in the First Amended Complaint that are relevant to the Court's determination of the Motion.[1]

5.     BAB is a California corporation with its principal place of business in San Juan Capistrano, California that is wholly owned by its founder and principal, Don Francisco ("Francisco"). The Company is in the business of designing, manufacturing,

---

[1] Defendants argue that the Court should ignore BAB's factual allegations in its First Amended Complaint that are materially different from those asserted in its original Complaint and should consider factual allegations deleted from the original Complaint that, if considered, Defendants contend would defeat BAB's various claims. (Mem. Law Supp. Defs.' Mot. Dismiss Am. Compl. 13 n.3, 19 n.5 [hereinafter "Defs.' Supp. Br."], ECF No. 43 (citing *Kant v. Columbia Univ.*, No. 08 Civ. 7476 (PGG), 2010 U.S. Dist. LEXIS 21900, at *20 (S.D.N.Y. Mar. 9, 2010)).) North Carolina law, however, does not permit Defendants' suggested course. *See, e.g.*, *Hyder v. Dergance*, 76 N.C. App. 317, 319–20, 332 S.E.2d 713, 714 (1985) ("[A]n amended complaint has the effect of superseding the original complaint.").

and selling durable medical equipment ("DME"),[2] in particular, certain maternity compression garments designed to assist mothers during pregnancy and after childbirth.[3] (FAC ¶¶ 7, 14–15.)

6.    BAB alleges that, beginning in 2012, the Company became the first DME manufacturer to sell maternity compression garments specifically tailored to post-pregnancy medical conditions, (FAC ¶¶ 15–20, 35), and, subsequently, the first seller to successfully qualify pre-birth maternity bands and postpartum compression garments for insurance reimbursement, (FAC ¶¶ 34–36).

7.    BAB contends that because it created the postpartum compression garment market segment and developed unique products with accompanying professional research, white papers, and insurance coding that permitted public or private purchasers of its products to obtain insurance reimbursement,[4] the Company was very valuable and enjoyed a promising and lucrative future at the time it first conducted business with Defendants. (FAC ¶¶ 21, 25, 36–37.)

8.    According to BAB, this future had become especially promising beginning in 2013 when the federal Affordable Care Act ("ACA") required health insurance policies

---

[2] BAB asserts that DME "is a term of art in the healthcare industry that refers to equipment which can withstand repeated use, is primarily and customarily used to serve a medical purpose, generally is not useful to a person in the absence of an illness or injury, and is appropriate for use in the home." (First Am. Compl. ¶ 8 [hereinafter "FAC"], ECF No. 40.)

[3] According to the Company, its products made a "meaningful contribution to the treatment" of "twelve medical conditions seen in pregnant and postpartum mothers – back pain, posture, pubic symphysis, pelvic joint pain, post-op pain, perineum pain, perineal tears, pelvic girdle pain, rectus diastasis, sciatic pain, and swelling/edema[.]" (FAC ¶ 24.)

[4] According to BAB, from the beginning, its maternity compression garments were designed to be covered by health insurance plans, (FAC ¶ 21), and were the first to be categorized as a "medical necessity" for insurance purposes, (FAC ¶¶ 22, 248).

to cover breast pumps for mothers without shared cost. (FAC ¶ 43.) With breast pumps and BAB's products enjoying a symbiotic relationship and breast pump demand increasing as a result of the ACA mandate, BAB determined that it could best maximize its profits by selling its products through existing breast pump distribution channels previously established by certain DME distributors. (FAC ¶¶ 43–46, 255.)

9. In executing on that strategy, BAB decided to first sell its products through a regional DME distributor with "the goal of [establishing] a working venture with a national DME distributor[.]" (FAC ¶¶ 47–51.) As a result, BAB engaged a company called 1 Natural Way, a regional DME subcontractor for Aeroflow, "to plan and launch into the DME supplier model." (FAC ¶ 51.) After implementation of the model, "[t]he market grew, as did the business with 1 Natural Way[,]" (FAC ¶ 51), convincing BAB that "[t]he BAB model proved to work regionally," (FAC ¶ 52). Buoyed by that success, BAB decided that "the next step was the engagement of a national DME." (FAC ¶ 52.) As a result, beginning in May 2018, BAB approached a number of national DME distributors and pitched its model through one-on-one sales calls and presentations. (FAC ¶ 53.)

10. During this timeframe, on July 19, 2018, Evan Israel ("Israel"), Aeroflow's Director of New Business Development, telephoned BAB's Francisco (the "July 19 Call") upon the recommendation of 1 Natural Way "to inquire about . . . BAB's work and its desire to engage BAB in a business venture." (FAC ¶ 54.) According to the Company, "BAB and Aeroflow struck what BAB thought was an agreement in that

[July 19 Call] to jointly devote resources to the opening of new markets identified and created by BAB." (FAC ¶ 65.) Pursuant to that agreement, "BAB was to contribute its specially designed products[,]" various product descriptions, insurance codes, medical literature and studies information, product images, sizing charts, training manuals, in-house training, and the "technical know-how to sell the products and interface with insurance payers to insure coverage." (FAC ¶ 66.) In exchange, "Aeroflow agreed to provide its established channels for distribution and to undertake the mechanics of processing sales and insurance claims." (FAC ¶ 67.) Through this arrangement, BAB expected to achieve national distribution of its products through Aeroflow's existing breast pump distribution channels. (FAC ¶¶ 43–44, 48, 255.)

11. Of particular relevance to this dispute, BAB alleges that "Francisco and Israel specifically discussed in the [July 19 Call] that keeping the BAB business plan secret and confidential was the key to successfully profiting from the new venture." (FAC ¶ 63.) According to BAB, "Israel specifically promised [in the July 19 Call], on Aeroflow's behalf, not to disclose BAB's specialized plans, including any proprietary medical provider authorization forms or white papers, to BAB's competitors and/or potential competitors[,]" (FAC ¶ 118), and "not to disclose BAB's information to consumers[,]" (FAC ¶ 64). BAB also avers that "Israel and Aeroflow made specific representations to Francisco and BAB [in the July 19 Call] of their intent to keep the comprehensive BAB business plan confidential so that both parties could mutually profit from the creation of a new market." (FAC ¶ 64.) BAB claims that, after months of searching for a national DME distributor, BAB chose to work with Aeroflow as a

result of these alleged promises and began disclosing the business plan to Aeroflow. (FAC ¶¶ 53–54, 70, 147–48.)

12. BAB alleges that in the months that followed, BAB continued to provide confidential Company information to Aeroflow, led training related to BAB's products for Aeroflow and Motif employees, and prepared to ramp up production. At the same time, and without BAB's knowledge, Aeroflow increased its compression customer service staff, ordered BAB's products from Amazon, copied those products, and began selling BAB's products under the Motif label as well as Motif products copied from BAB's designs. (FAC ¶¶ 74–75, 79–80, 88, 94, 96, 99–100, 107–08, 153–54, 156.) BAB further alleges that Aeroflow and Motif used BAB's images, product descriptions with specific terminology, and size charts—all with BAB's labels and identification removed—to market and sell these products on their websites. (FAC ¶¶ 99–103, 178.) Ultimately, Aeroflow ceased doing business with BAB and, according to BAB, misappropriated BAB's comprehensive business plan to engage in direct competition against BAB through its Motif subsidiary. (FAC ¶¶ 107, 109, 234, 236, 272.)

13. BAB initiated this action against Aeroflow and Motif on August 23, 2019, (ECF No. 3), and subsequently filed its First Amended Complaint on December 20, 2019, (ECF No. 40). BAB's current claims against Defendants are framed as joint venture and breach of the duty of good faith and fair dealing; constructive fraud; trade secret misappropriation; fraud and fraudulent concealment; unfair and deceptive trade practices, including common law unfair competition and violation of the federal Lanham Act, 15 U.S.C. § 1125(a), and North Carolina's Unfair and Deceptive Trade

Practices Act ("UDTPA"), N.C.G.S. § 75-1.1; and unjust enrichment. BAB also seeks punitive damages as well as attorneys' fees based on its UDTPA claim. (FAC ¶¶ 110–289.)

14. Defendants filed the Motion on January 9, 2020 seeking dismissal of all claims. After full briefing by the parties, the Court held a hearing on the Motion by videoconference on June 3, 2020, at which all parties were represented by counsel. The Motion is now ripe for resolution.

II.

LEGAL STANDARD

15. When ruling on a motion to dismiss under Rule 12(b)(6), the Court views the allegations in the complaint "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017) (quoting *Kirby v. N.C. DOT*, 368 N.C. 847, 852, 786 S.E.2d 919, 923 (2016)). The Court examines "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736 (2018) (quoting *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51, 790 S.E.2d 657, 659 (2016)). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Izydore v. Alade*, 242 N.C. App. 434, 438, 775 S.E.2d 341, 345 (2015) (quoting *Strickland v. Hedrick*, 194 N.C. App. 1, 20, 669 S.E.2d 61, 73 (2008)).

16. Dismissal under Rule 12(b)(6) "is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin*, 371 N.C. at 615, 821 S.E.2d at 736–37 (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).

## III.

## ANALYSIS

### A. Joint Venture/Breach of the Duty of Good Faith and Fair Dealing

#### i. Joint Venture

17. BAB alleges that BAB and Aeroflow entered into a joint venture relationship during the July 19 Call, (FAC ¶¶ 63, 65–68, 191), and that Aeroflow subsequently breached its "implied duty to act upon principles of good faith and fair dealing and to make reasonable efforts to perform its obligations under the agreement" when it ceased doing business with BAB and chose to sell competitive maternity compression garments through its Motif subsidiary, (FAC ¶¶ 227–29).

18. Under North Carolina law, "[a] joint venture exists when there is: (1) an agreement, express or implied, to carry out a single business venture *with joint sharing of profits*, and (2) an *equal right of control* of the means employed to carry out the venture." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 340–41, 828 S.E.2d 467, 476 (2019) (citation and internal quotation marks omitted). "[A]n agreement for the sharing of profits is [therefore] essential to the creation of a joint venture[.]"

*Rockingham Square Shopping Ctr., Inc. v. Integon Life Ins. Corp.*, 52 N.C. App. 633, 646, 279 S.E.2d 918, 926 (1981).

19.　Aeroflow contends that BAB has failed to allege facts showing a joint sharing of profits, requiring dismissal of BAB's joint venture claim.  (Defs.' Supp. Br. 14.) BAB argues in opposition that it has met its pleading burden by alleging that its relationship with Aeroflow "was not a typical manufacturer-distributor relationship because the market was brand-new[,]" (FAC ¶ 195), that it engaged with Aeroflow in an "extremely close collaboration in executing the joint venture agreement[,]" (FAC ¶ 201), and that "BAB and Aeroflow jointly sought profit in the venture[,]" (FAC ¶ 220; *see generally* FAC ¶¶ 190–230).  None of these allegations, however, reflects that the parties agreed to a joint sharing of profits.

20.　Indeed, BAB's more specific allegations show that what it contends was an agreement to jointly share profits was nothing of the sort:

> The pricing of BAB products was an ongoing matter between BAB and Aeroflow.  Larger purchases correlated with scale pricing, to increase Aeroflow profit margin in consideration of shifting inventory level risk from BAB to Aeroflow.  Profit levels for a party varied in inverse proportion to the shifting of risk.  The more risk a party shifted the less profit it realized.  The less risk it shifted to the other party, the more profit it realized.

(FAC ¶ 219.)  Rather than allege a joint sharing of profits, BAB's allegations show, at most, an agreement to adjust unit prices based on volume, with larger orders receiving lower per unit prices—i.e., volume discounts.  Bulk order pricing between buyers and sellers, however, without more, does not create a joint venture under law.

21. Read in the light most favorable to BAB as the non-moving party, BAB's allegations suggest only that BAB and Aeroflow shared an expectation that their business relationship—in which Aeroflow simply bought BAB's products for resale—would generate profits for each, not that they agreed to share profits jointly. As a result, Plaintiff's joint venture claim necessarily fails and must be dismissed. *See, e.g.*, *Sykes*, 372 N.C. at 341, 828 S.E.2d at 476 (finding no joint venture because there was an "unequal sharing of profits and losses"); *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 327, 572 S.E.2d 200, 205 (2002) (finding no joint sharing of profits where "plaintiffs failed to allege in their complaint that they were entitled to share in defendants' profits under the terms of the agreement"); *cf. Lake Colony Constr., Inc. v. Boyd*, 212 N.C. App. 300, 306–07, 711 S.E.2d 742, 747 (2011) (finding joint sharing of profits where the parties' contract "expressly provided for the sharing of profits" under which "proceeds would first go to covering certain costs incurred in funding the project, then to [plaintiff] up to $25,000.00, then to [defendant] up to $25,000.00, and then split 50/50 between the parties").[5]

### ii. Breach of the Duty of Good Faith and Fair Dealing

22. Defendants contend that BAB's related claim for breach of an implied covenant of good faith and fair dealing rises and falls with its joint venture claim and

---

[5] Two of the cases on which BAB principally relies—*Slaughter v. Slaughter*, 93 N.C. App. 717, 379 S.E.2d 98 (1989) (joint venture where brothers-in-law worked together to dredge a pond) and *Best Cartage, Inc. v. Stonewall Packaging, LLC*, 219 N.C. App. 429, 727 S.E.2d 291 (2012) (joint venture where the defendants shared employees, officers, and directors and one defendant purchased the real property and equipment used by the other defendant)—are distinguishable on their facts as not involving the sort of buyer-seller relationship present here. The other case relied upon by BAB—*Lake Colony Constr.*—actually supports the Court's conclusion, as indicated above.

thus should be dismissed since the Court has determined that the joint venture claim is subject to dismissal. Although BAB did not address Defendants' argument in its opposition brief, (*see* Pl.'s Resp. Br. Defs.' First Am. Mot. Dismiss [hereinafter "Pl.'s Resp. Br."], ECF No. 48), our Supreme Court has instructed that "the trial court should not dismiss the complaint unless it appears beyond doubt that [the] plaintiff could prove no set of facts in support of his claim which would entitle him to relief[,]" *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444, 666 S.E.2d 107, 116 (2008) (quoting *Meyer v. Walls*, 347 N.C. 97, 111–12, 489 S.E.2d 880, 888 (1997)). Applying that standard here, the Court concludes that Defendants' Motion to dismiss BAB's implied covenant claim should be denied.

23. The Court begins by noting that although BAB complains that Defendants' conduct was inconsistent with the parties' agreement, BAB elected not to allege a breach of contract claim in this action. BAB chose instead to assert a claim it titled "joint venture and breach of the duty of good faith and fair dealing[.]" (FAC § VI.)

24. Notwithstanding BAB's election, and although Defendants argue to the contrary, (Defs.' Supp. Br. 16), the Court concludes that BAB has pleaded facts sufficient under Rule 12(b)(6) to show that it entered into an agreement with Aeroflow for the purchase and sale of BAB's products and to keep BAB's confidential information secret, (*see, e.g.*, FAC ¶¶ 64–68, 72, 118, 191–94), and that Aeroflow breached both prongs of that agreement, (*see, e.g.*, FAC ¶¶ 81, 155–56, 228–29). Although the Court has determined that the parties' alleged business relationship did not constitute a joint venture under North Carolina law because their agreement

did not include a joint sharing of profits, the Court has not determined that the parties' agreement as stated above was invalid or otherwise unenforceable as a matter of law.

25. North Carolina law has long recognized that a covenant of good faith and fair dealing is implied in every contract and requires the contracting parties not to "do anything which injures the rights of the other to receive the benefits of the agreement." *Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (citation omitted). While implied covenant claims are nearly always paired with a breach of contract claim in North Carolina practice, they need not be. *See, e.g.*, *Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 556, 643 S.E.2d 410, 426 (2007) (concluding that North Carolina courts have not held "that a party alleging breach of the duty of good faith and fair dealing must allege a breach of contract"); *see also* *Robinson v. Deutsche Bank Nat'l Tr. Co.*, No. 5:12-CV-590-F, 2013 U.S. Dist. LEXIS 50797, at *39 (E.D.N.C. Apr. 9, 2013) (citing *Richardson* and holding that "[t]he fact that [p]laintiff does not allege a breach of a specific provision of [a contract] does not, therefore, doom her [implied covenant] claim").

26. Because the Court concludes that BAB has alleged a contractual relationship with Aeroflow sufficient to support its implied covenant claim, Defendants' motion to dismiss that claim must be denied.

B. Constructive Fraud

27. BAB brings a claim against Aeroflow for constructive fraud, alleging that BAB and Aeroflow had a "business relationship of trust and confidence" which

Aeroflow used to "further its own best interests" by using BAB's product designs and business model "for the importing of, production of, and sale of insurance-covered maternity support and postpartum compression recovery garments to the exclusion of BAB." (FAC ¶¶ 232, 234.)

28. To sustain a claim for constructive fraud, a plaintiff must allege facts and circumstances "(1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9, 812 S.E.2d 831, 837 (2018) (quoting *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950)).

29. Significantly, however, a claim for constructive fraud based, as here, on "a relationship of trust and confidence that allegedly arose from the parties' joint venture" cannot be maintained where a plaintiff fails to show the existence of a joint venture. *Se. Shelter Corp.*, 154 N.C. App. at 329, 572 S.E.2d at 206. Accordingly, because the Court has found that BAB's joint venture claim is fatally deficient, BAB's constructive fraud claim must be dismissed to the extent it is based on an alleged fiduciary relationship arising from the purported joint venture between the parties.

30. Rather than confine its constructive fraud claim to the duty arising from the alleged joint venture, however, BAB contends that it has also pleaded that the parties had a relationship of trust and confidence based on the parties' "collaborative transactions" that existed outside the joint venture relationship. (Pl.'s Resp. Br. 13 (citing FAC ¶¶ 53–67, 70–75, 87, 88, 91, 232–37).) The specific allegations on which

BAB relies, however, do not support its claim. Paragraph 68 makes plain that paragraphs 53–67 relate to the alleged joint venture agreement. (FAC ¶ 68 ("That was the intended joint venture agreement.").) So do paragraphs 70 through 75. (FAC ¶ 70 (referencing "the BAB and Aeroflow venture"), ¶¶ 71–72 (referencing document "specifically shared in pursuit of the goals of the joint venture/partnership"),¶¶ 74–75 (relating to components of the alleged joint venture).) The other cited allegations either do not establish a fiduciary duty, (FAC ¶¶ 87, 88, 91), or are either conclusory assertions that the Court may disregard under Rule 12(b)(6), *see Izydore*, 242 N.C. App. at 438, 775 S.E.2d at 345, or relate to the alleged duty arising from the purported joint venture, (FAC ¶¶ 232–37).

31. There are certainly no allegations from which a factfinder might reasonably conclude that Aeroflow or Motif "figuratively [held] all the cards" in Defendants' relationship with BAB as required for a "de facto" fiduciary relationship. *Lockerman v. S. River Elec. Membership Corp.*, 250 N.C. App. 631, 636, 794 S.E.2d 346, 352 (2016) (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008)). And BAB does not even attempt to argue that it had a "de jure" fiduciary relationship with either Defendant as a matter of law. *See, e.g.*, *King v. Bryant*, 369 N.C. 451, 464, 795 S.E.2d 340, 349 (2017) (listing *de jure* fiduciary relationships to include "between spouses, attorney and client, trustee and beneficiary, members of a partnership, and physician and patient" (citations omitted)); *CommScope Credit Union*, 369 N.C. at 52, 790 S.E.2d at 660 ("The list of

relationships that we have held to be fiduciary in their very nature is a limited one, and we do not add to it lightly." (citation omitted)).

32. Accordingly, the Court concludes that BAB's constructive fraud claim necessarily fails and must be dismissed.

C. Trade Secret Misappropriation

33. BAB asserts a claim against both Defendants for trade secret misappropriation under the North Carolina Trade Secret Protection Act ("NCTSPA"), N.C.G.S. § 66-152, *et seq.* BAB specifically alleges that its misappropriated trade secret is its "business process and model[,]" (FAC ¶ 245), and consists of "a cocktail of components[,]" (FAC ¶ 259). BAB identifies these components as its "[u]nique scientific designs, compilation of relevant diagnostic codes, product design-medical condition scientific connection, positioning for insurance coverage, [and] riding the lines of [Aeroflow's already-established] breast pump distribution[.]" (FAC ¶¶ 255–56, 258.) According to BAB, the "trade secret is the convergence of [these] components into a profitable business process and model." (FAC ¶ 257.)

34. Defendants argue that BAB's misappropriation claim must be dismissed for two independent reasons: first, because BAB's alleged trade secrets were already known in the industry, available in the marketplace, and easy to engineer, and, second, because BAB failed to plead that it took reasonable efforts to maintain the secrecy of those alleged trade secrets. (Defs.' Supp. Br. 7–14.) The Court finds neither contention meritorious under Rule 12(b)(6).

35.     The NCTSPA provides that an "owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret." N.C.G.S. § 66-153. The NCTSPA defines a protectable trade secret as follows:

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

36.     The North Carolina courts consider the following six factors in determining whether information constitutes a trade secret:

> (1) [t]he extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; [(4)] the value of information to [the] business and its competitors; [(5)] the amount of effort or money expended in developing the information; and [(6)] the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997) (citation omitted). "These factors overlap, and courts do not always examine them separately and individually." *DSM Dyneema, LLC v. Thagard*, 2019 NCBC LEXIS 44, at *21 (N.C. Super. Ct. June 19, 2019).

37.     Defendants first argue that BAB's alleged trade secrets are already known and available in the industry, readily observable in the marketplace, and consist of

"compilations comprised solely of publicly available information[,]" each of which, standing alone, merits dismissal of BAB's claim. (Defs.' Supp. Br. 8.) Defendants support this argument, however, with factual assertions not found in the First Amended Complaint, including: (i) "any competitor can copy [BAB's] design concepts from the finished product[,]" (Defs.' Supp. Br. 9); (ii) "[e]ventually, this insurance coding information also became available to insurers and patients when BAB's products were ordered as DME[,]" (Defs.' Supp. Br. 10); (iii) "BAB's distribution mode . . . is a standard practice known to all participants in the DME industry[,]" (Defs.' Supp. Br. 10); and (iv) "BAB realized [the business model's] value only through the marketing and sales of its products[,]" (Defs.' Supp. Br. 11). Because the Court cannot reach these conclusions from a review of BAB's pleading, the Court concludes that Defendants' arguments are not proper under Rule 12(b)(6) and more appropriately advanced upon the presentation of evidence at summary judgment.

38. Defendants next contend that BAB's pleading demonstrates that it has failed to make reasonable efforts to maintain the secrecy of its alleged trade secrets as a matter of law. Our courts have recognized that whether a plaintiff's efforts to maintain the secrecy of a trade secret is reasonable is "necessarily [a] fact dependent" inquiry and one that requires courts to "closely examine the circumstances surrounding the trade secret[.]" *SiteLink Software, LLC v. Red Nova Labs, Inc.*, 2018 NCBC LEXIS 90, at *28 (N.C. Super. Ct. Aug. 20, 2018) (quoting *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at *15 (N.C. Super. Ct. May 1, 2015)).

39.    Here, BAB alleges that "the only way for [its] trade secret to be fully implemented was to share the information with Aeroflow." (FAC ¶ 264.) To maintain the secrecy of that information, BAB alleges, in part, that:

(i)    Israel and Aeroflow "specifically promised in the [July 19 Call] not to disclose BAB's information to consumers[,]" (FAC ¶ 64);

(ii)    BAB's information "was agreed [by Aeroflow] to be kept confidential and not distributed to potential BAB competitors[,]" (FAC ¶ 72);

(iii)    "Aeroflow expressly agreed to keep confidential and not disclose the business process and model to any BAB competitors," (FAC ¶ 88); and

(iv)    "Israel specifically promised, on Aeroflow's behalf, [on the July 19 Call] not to disclose BAB's specialized plans, including any proprietary medical provider authorization forms or white papers, to BAB's competitors and/or potential competitors[,]" (FAC ¶ 118).

40.    These allegations reflect Aeroflow's oral agreement not to disclose the confidential information it received from BAB. The Court concludes that this alleged oral non-disclosure agreement, even without more, permitted BAB more than a mere "expectation of confidentiality" and constitutes an "act by which [BAB] attempted to maintain the secrecy of the alleged trade secret" under Chapter 66. *Krawiec v. Manly*, 370 N.C. 602, 612, 811 S.E.2d 542, 549 (2018) (holding that a plaintiff's mere "expectation of confidentiality[,]" without allegations of a "method, plan or other act

by which [plaintiff] attempted to maintain the secrecy of the alleged trade secrets[,]" was insufficient under Rule 12(b)(6)).[6]

41. As such, the Court concludes that BAB's allegations satisfy the minimal burden BAB must meet under Rule 12(b)(6) to plead sufficient reasonable efforts to sustain its trade secret claim. *See, e.g.*, *Bldg. Ctr., Inc. v. Carter Lumber, Inc.*, 2016 NCBC LEXIS 79, at *14 (N.C. Super. Ct. Oct. 21, 2016) ("Generally, only where efforts to maintain secrecy of the allegedly misappropriated trade secrets were completely absent have North Carolina courts dismissed claims at the [pleadings] stage."); *see also, e.g.*, *TaiDoc Tech. Corp. v. OK Biotech Co.*, 2016 NCBC LEXIS 26, at *23–24

---

[6] The only other allegations that arguably show BAB's efforts to maintain the secrecy of its alleged trade secrets involve Aeroflow's expression of its intent not to disclose BAB's secrets and Aeroflow's agreement that confidentiality was important to the success of its business relationship with BAB. (*See, e.g.*, FAC ¶ 63 ("Francisco and Israel specifically discussed in the [July 19 Call] that keeping the BAB business plan secret and confidential was the key to successfully profiting from the new venture."); ¶ 64 ("Israel and Aeroflow made specific representations to Francisco and BAB of their intent to keep the comprehensive BAB business plan confidential[.]"); ¶ 264 ("BAB communicated repeatedly to Aeroflow that it was not authorized to share its trade secrets and confidential information with potential competitors[,]" and "[t]he parties expressly agreed that confidentiality of the information to be provided to Aeroflow was critical to the development of the newly invented market of postpartum compression."). These allegations, however, while perhaps additive to Aeroflow's alleged agreement in analyzing BAB's reasonable efforts, created only a mere "expectation of confidentiality[,]" providing little weight in that analysis. *See Krawiec*, 370 N.C. at 612, 811 S.E.2d at 549.

(N.C. Super. Ct. Mar. 28, 2016) (finding oral non-disclosure agreements to constitute reasonable efforts to maintain secrecy in the circumstances).[7]

42.     Accordingly, the Court concludes that Defendants' Motion to dismiss BAB's trade secret misappropriation claim should be denied.

D.     <u>Fraud and Fraudulent Concealment</u>

43.     BAB asserts claims for fraudulent misrepresentation and for fraudulent concealment in the face of a duty to disclose.  As to the former, BAB alleges that Aeroflow falsely represented that it would keep BAB's business plan and model confidential, (FAC ¶¶ 63–64, 118), when it had no intention of doing so, (FAC ¶¶ 83, 86, 136), and that Aeroflow executives made "false assurances" to BAB that Aeroflow intended to have a long-term relationship with the Company, (FAC ¶ 121).  As to the latter, BAB alleges that Defendants breached a duty to disclose by concealing from BAB that they "intended to, and did, commence a plan . . . to create, manufacture, and sell a line of products that were copied from BAB, and to utilize BAB's own painstakingly crafted business plan" to compete against BAB.  (FAC ¶ 112; *see also*

---

[7] Defendants correctly point out that completely absent from the FAC are any allegations that BAB offered or obtained a written non-disclosure agreement from Aeroflow or a written or oral non-disclosure agreement from BAB's employees, the medical practice it worked with to develop its insurance reimbursement model, the insurance companies to which BAB disclosed its insurance codes, the physicians who provided BAB with supporting scientific studies, or the retail stores through which it sold its products. (FAC ¶¶ 25, 35–36, 40–41, 248–49.) Likewise, BAB nowhere alleges that it obtained a non-disclosure agreement from 1 Natural Way, its regional distributor with whom BAB launched the same "BAB model" that it claims as its trade secret and later initiated with Aeroflow on a national scale, (FAC ¶ 52), or from any of the national DME providers to whom it made "sales calls and presentations" at the same time it was in discussions with Aeroflow, (FAC ¶ 53). Defendants' argument, however, invites an examination of the circumstances surrounding the absence of such agreements, which is most appropriate upon the presentation of evidence under Rule 56.

FAC ¶ 116 (alleging Defendants concealed their plan to "copy and duplicate BAB's business").)

44.    Defendants seek dismissal of both fraud claims, asserting that BAB has failed to allege fraud with requisite particularity, to plead a cognizable injury, and, with respect to fraudulent concealment, to plead facts giving rise to a duty to disclose. (Defs.' Supp. Br. 16–21.)  The Court addresses each contention in turn.

i.    <u>Pleading Fraud with Particularity</u>

45.    Rule 9(b) requires that "[i]n all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." N.C. R. Civ. P. 9(b).  To meet the particularity requirement for a fraudulent misrepresentation claim, a plaintiff must allege the "time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations."  *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981).

46.    In contrast, "[f]raudulent concealment or fraud by omission is, by its very nature, difficult to plead with particularity." *McKee v. James*, 2013 NCBC LEXIS 33, at *22 (N.C. Super. Ct. July 24, 2013) (quoting *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *9 (N.C. Super. Ct. June 18, 2007)).  Fraud claims based on omission require a plaintiff to allege:

> (1) the relationship [between plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the

defendant] gained by withholding information; (6) why plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Lawrence*, 2007 NCBC LEXIS 20, at *9 (quoting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195–96 (M.D.N.C. 1997)).

47. Defendants argue that BAB has failed to plead both its misrepresentation-based and omission-based fraud claims with requisite particularity.

48. The Court tests first BAB's allegations supporting its fraudulent misrepresentation claim. Some of those allegations are asserted in conclusory fashion. (*See, e.g.*, FAC ¶ 134 ("[Defendants] employed both false representations and concealment to keep their secret."); ¶ 147 ("Aeroflow, through its false promises . . .").) Others are made without identifying who made the misrepresentations. (*See, e.g.*, FAC ¶ 121 ("[Aeroflow's] executives made further false assurances . . ."), ¶ 123 ("Aeroflow falsely represented . . ."), ¶ 137 ("[Aeroflow made] promises and assurances . . .").) Others still fail to identify when or where such representations were made. (*See, e.g.*, FAC ¶ 139 ("Fonville . . . and . . . Hill . . . and . . . Jordan . . . all concocted a false story in order to find a way to justify the nefarious activity discussed throughout this complaint.").) None is sufficient to meet Rule 9(b)'s particularity requirement. *See, e.g.*, *USA Trouser, S.A. de C.V. v. Williams*, 258 N.C. App. 192, 202–03, 812 S.E.2d 373, 380 (2018) (affirming dismissal of fraud claim for lack of particularity where plaintiff did not allege speaker's identity or the time or place of alleged misrepresentations); *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 39, 626 S.E.2d 315, 321 (2006) (finding statements made by "representatives"

too "vague and general" to sustain fraud claim because pleader "did not identify which representatives gave him false information, nor did he specifically allege where or when he received the information").

49. Additional allegations concern the July 19 Call. Those fare better for BAB. BAB alleges that Francisco and Israel "discussed in the July 19, 2018 phone call that keeping the BAB business plan secret and confidential was the key to successfully profiting from the new venture[,]" (FAC ¶ 63), and that "Israel and Aeroflow made specific representations to Francisco and BAB of their intent to keep the comprehensive BAB business plan confidential[,]" (FAC ¶ 64). BAB further alleges that as a result of the July 19 Call, Francisco provided to Israel and Aeroflow BAB's purported trade secret, its business plan and its component parts, resulting in substantial injury to BAB. (FAC ¶¶ 70–72, 74–75, 81, 119–120.) BAB has alleged the time (July 19, 2018), place (telephone), content (promises of confidentiality), identity of the person making the representation (Israel), and what was obtained as a result (BAB's alleged trade secret), thus satisfying *Terry*'s requirements for Rule 9(b) pleading.

50. The Court reaches similar conclusions concerning BAB's omission-based fraud claim. To state that claim, BAB alleges as follows:

> Throughout the business relationship with BAB, Aeroflow concealed a material fact from BAB: [t]hat Aeroflow intended to, and did, commence a plan in conjunction with its subsidiary Motif, to create, manufacture, and sell a line of products that were copied from BAB, and to utilize BAB's own painstakingly crafted business plan to seize away from BAB its profitable and carefully cultivated advantage in the very markets it created and pioneered, insurance covered pre-birth maternity bands and

postpartum compression garments specifically tailored to birthing method, also covered by insurance.

(FAC ¶ 112.) BAB further alleges that "Aeroflow took affirmative steps to conceal material facts from BAB, through multiple acts of deception, in order to continue the con and gather needed information, facts that, once concealed, give rise to a duty to disclose." (FAC ¶ 116.) And as to the July 19 Call, BAB avers that "Israel specifically promised, on Aeroflow's behalf, not to disclose BAB's specialized plans, including any proprietary medical provider authorization forms or white papers, to BAB's competitors and/or potential competitors[,]" (FAC ¶ 118), without telling BAB that Aeroflow would not fulfill that promise, (FAC ¶¶ 83, 86, 136).

51. Similar to BAB's misrepresentation-based claim, except for the July 19 Call, BAB has failed to plead "the identity of those under a duty who failed to make [the required] disclosures[.]" *Lawrence*, 2007 NCBC LEXIS 20, at *9 (citation omitted). As a result, BAB's omission-based fraud claim must be denied to this extent. And as with the misrepresentation-based claim, the Court further concludes that BAB's allegations in support of its omission-based fraud claim that focus on Israel and the July 19 Call are sufficient to survive dismissal under Rule 12(b)(6).

52. Defendants' various arguments in opposition are without merit. First, Defendants' contention that BAB failed to sufficiently allege BAB's knowledge and intent ignores Rule 9(b)'s instruction that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." N.C. R. Civ. P 9(b). BAB has done so here. (*See, e.g.*, FAC ¶ 83 ("Nor did Aeroflow inform BAB of the true purpose and intent behind the disclosure to Motif: [t]o allow Motif to copy the BAB

product and business plan, place in Aeroflow inventory, capture the markets BAB and Francisco had so carefully created and cultivated, and eliminate BAB from the picture."), ¶ 136 ("Upon information and belief, Defendants' intention to dupe Francisco and BAB occurred as early as the July 19, 2018 Israel and Francisco conversation[.]").)

53. Defendants' Rule 9(b) challenge to BAB's intent-based allegations made "upon information and belief" is similarly unavailing. A plaintiff may make allegations of fraud upon information and belief "when the matters are particularly within the defendants' knowledge, and facts are stated upon which the belief is founded." *Breeden*, 171 F.R.D. at 197; *see also Lawrence*, 2007 NCBC LEXIS 20, at *11. As pleaded here, not only is Israel's intent when making his promises uniquely within Defendants' knowledge, but BAB has pleaded a factual basis for its belief for that alleged intent. (*See, e.g.*, FAC ¶¶ 108, 153 (alleging that Aeroflow suddenly increased in customer service representatives shortly after the July 19 Call), ¶¶ 79–80 (alleging that Motif purchased BAB garments for copying in August 2018), ¶¶ 94–96, 153 (alleging that Motif received copied products in November 2018).)

54. Finally, Defendants' contention that BAB failed to allege that Aeroflow, through Israel, knew at the time of Israel's representation that Aeroflow did not intend to perform his promise, (Defs.' Supp. Br. 20), is contrary to BAB's pleading when read in the light most favorable to BAB. (*See, e.g.*, FAC ¶ 86 ("Upon information and belief, Aeroflow devised this plan as early as July 19, 2018 when Israel had his first phone call with Francisco[.]"), ¶ 136 ("Upon information and belief, Defendants'

intention to dupe Francisco and BAB occurred as early as the July 19, 2018 Israel and Francisco conversation[.]").)

### ii. Pleading Cognizable Injury

55. Defendants also assert that BAB has failed to plead a cognizable injury to support its fraud claim. The Court disagrees. BAB alleges both that "Aeroflow and Motif are generating massive profits as they have seized away from BAB the highly profitable market advantage that BAB carefully cultivated over many years[,]" (FAC ¶ 157), and that "[a]s a direct and proximate result of Aeroflow's fraudulent representations and/or fraudulent concealment, BAB has suffered damages in excess of $25,000, in fact, damages in the millions have been suffered[,]" (FAC ¶ 159). The Court finds these allegations sufficient for purposes of Rule 12(b)(6).

### iii. Pleading Facts Showing a Duty to Disclose

56. Defendants argue that BAB's fraudulent concealment claim should also be dismissed because BAB has failed to allege facts showing that Defendants had a duty to disclose material facts to BAB, (Defs.' Supp. Br. 21), and, in particular, that BAB failed to allege that Aeroflow took any affirmative steps to conceal material facts from BAB.[8]

57. "Where a fraud claim arises by concealment or nondisclosure of material facts, a plaintiff must allege that the defendant(s) 'had a duty to disclose material

---

[8] Defendants also contend, without reference to case law, that BAB cannot rely on the same alleged facts to support its misrepresentation and omission-based claims. (Reply Br. Supp. Defs.' Mot. Dismiss First Am. Compl. Under Rule 12(b)(6) 3 [hereinafter "Defs.' Reply Br."], ECF No. 52.) The Court finds this argument without merit. *See Herrera v. Charlotte Sch. of Law, LLC*, 2018 NCBC LEXIS 35, at *36–37 (N.C. Super. Ct. Apr. 20, 2018) (considering factual allegations supporting both claims).

information to [the plaintiff], as silence is fraudulent only when there is a duty to speak.'" *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *102 (N.C. Super. Ct. Dec. 31, 2019) (quoting *Lawrence*, 2007 NCBC LEXIS 20, at *8); *see also Griffin v. Wheeler-Leonard & Co.*, 290 N.C. 185, 198, 225 S.E.2d 557, 565 (1976) ("[I]t is well settled that where there is a duty to speak the concealment of a material fact is equivalent to fraudulent misrepresentation.").

58. A duty to disclose arises where:

> (1) there is a fiduciary relationship between the parties to the transaction; (2) "a party has taken affirmative steps to conceal material facts from the other;" or (3) "one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence."

*Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 2015 NCBC LEXIS 64, at *14 (N.C. Super. Ct. June 19, 2015), *aff'd*, 370 N.C. 1 (2017) (quoting *Harton v. Harton*, 81 N.C. App. 295, 297–98, 344 S.E.2d 117, 119 (1986)). "A concealed fact is considered material when it would have influenced the decision or judgment of another party, if known." *Tillery Envtl. LLC v. A&D Holdings, Inc.*, 2018 NCBC LEXIS 13, at *22 (N.C. Super. Ct. Feb. 9, 2018) (citing *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 75–76, 598 S.E.2d 396, 402 (2004)).

59. To show a duty to disclose based on affirmative steps to conceal a material fact, a plaintiff must allege the specific affirmative acts taken to conceal that fact. *See Zagaroli v. Neill*, 2016 NCBC LEXIS 106, at *23 (N.C. Super. Ct. Dec. 29, 2016) (dismissing fraud claim where defendants' failure to allege "any specific affirmative acts" to conceal forged checks did not establish a duty to disclose); *see also Shaw v.*

*Gee,* 2016 NCBC LEXIS 103, at \*11–14 (N.C. Super. Ct. Dec. 21, 2016) (finding that plaintiff sufficiently alleged defendant's duty to disclose where amended complaint asserted "specific affirmative acts" to conceal payments and payments were material facts).

60. Here, because the Court has dismissed BAB's omission-based claim under Rule 9(b) except to the extent that claim is based on the July 19 Call, the Court examines whether BAB has pleaded specific affirmative acts in connection with the July 19 Call giving rise to a duty to disclose material facts to BAB. The Court concludes that BAB has.

61. BAB alleges that Aeroflow, through Israel, "moved quickly to secure a business venture with BAB" in the July 19 Call with the intent to "initiate its plan of theft under the guise of a business engagement[,]" (FAC ¶¶ 58, 86), represented to BAB that it would "keep [BAB's] comprehensive business plan confidential[,]" (FAC ¶¶ 63, 64), and thereafter requested BAB to send confidential BAB business plan information to Aeroflow, (FAC ¶¶ 71, 88), all to induce BAB to provide its trade secret to Aeroflow without disclosing Aeroflow's plan to compete with the Company. BAB further alleges that Aeroflow ordered product from BAB, (FAC ¶ 73), "successfully use[d] the BAB plan to collect payment[,]" (FAC ¶ 73), ordered BAB's products from Amazon for the purpose of "pirating and copying" without notice to BAB, (FAC ¶ 79), began "producing a copied and competing line of products to BAB's products[,]" (FAC ¶ 84), and "induced BAB and Francisco to come and train its personnel in the effective

sales and marketing of the BAB products[,]" (FAC ¶ 87), which it would not have done had Defendants disclosed their true intent, (FAC ¶ 89).

62. The Court concludes that these allegations, premised, as BAB alleges, on the plan or scheme Defendants initiated on the July 19 Call, assert "specific affirmative acts" sufficient to support a duty to disclose material facts to BAB for purposes of Rule 12(b)(6).

63. For each of the reasons set forth above, therefore, the Court concludes that Defendants' Motion should be granted except to the extent that BAB's fraud claims are based on its allegations in connection with and arising from the July 19 Call.

E. Unfair and Deceptive Trade Practices

64. BAB asserts a claim for "unfair and deceptive practices" in three parts: (i) "actions, misrepresentations and fraudulent concealment[,]" (ii) "common law unfair and deceptive practices[,]" and (iii) "civil action under the Lanham Act[,]" 15 U.S.C. § 1125(a), which contains within it an assertion that Defendants have violated the UDTPA. (FAC § V.) It therefore appears to the Court that BAB is actually asserting claims against Defendants for common law unfair competition and violation of the UDTPA and the Lanham Act in this single "unfair and deceptive practices" claim. These component claims essentially relate to two types of alleged misconduct: (i) under the common law of unfair competition and the UDTPA, Defendants' alleged fraudulent and deceptive conduct in inducing BAB to divulge its confidential information to enable Defendants to compete against it (the "Unfairness Claims") and (ii) under the Lanham Act, the UDTPA, and the common law of unfair competition,

Defendants' alleged "reverse passing off" of BAB's products as Motif's in the marketplace (the "Reverse Passing Off Claims").

i. BAB's Unfairness Claims

65. To assert a claim for unfair and deceptive trade practices under N.C.G.S. § 75-1.1, a plaintiff must allege: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiff[ ]." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007) (quoting *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000)). " 'A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,' and a 'practice is deceptive if it has the capacity or tendency to deceive.' " *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 91, 747 S.E.2d 220, 228 (2013) (quoting *Walker*, 362 N.C. at 72, 653 S.E.2d at 399).

66. Similarly, the tort of common law unfair competition "consist[s] of acts or practices by a competitor which are likely to deceive the consuming public." *Stearns v. Genrad, Inc.*, 564 F. Supp. 1309, 1320 (M.D.N.C. 1983) (citing *Charcoal Steak House of Charlotte, Inc. v. Staley*, 263 N.C. 199, 139 S.E.2d 185 (1964)). "The gravamen of unfair competition is the protection of a business from misappropriation of its commercial advantage earned through organization, skill, labor, and money." *Henderson v. U.S. Fid. & Guar. Co.*, 346 N.C. 741, 749, 488 S.E.2d 234, 240 (1997). Common law unfair competition includes activity "such as trademark or trade name infringement, imitation of a competitor's product or its appearance, interference with

a competitor's contractual relations, disparagement of a competitor's product or business methods, and misappropriation of a competitor's intangible property rights such as advertising devices or business systems." *Stearns*, 564 F. Supp. at 1320.

67. Significantly for present purposes, "[c]ourts recognize that a claim for common law unfair competition is analyzed the same way as a claim for unfair or deceptive trade practices under [N.C.]G.S. § 75-1.1." *Global Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 159, at *33 (N.C. Super. Ct. Nov. 29, 2018); *see also BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 615 (M.D.N.C. 1999) ("The standard which a plaintiff must meet to recover on an unfair competition claim under the common law is not appreciably different [from a claim for unfair or deceptive trade practices]."); *Blue Rhino Glob. Sourcing, Inc. v. Well Traveled Imps., Inc.*, 888 F. Supp. 2d 718, 721 n.1 (M.D.N.C. 2012) (to similar effect).

68. BAB alleges that "Aeroflow's actions in feigning an agreement with BAB to jointly open new markets nationally while at the same time secretly making and executing plans to copy and take over BAB's business constitutes an unfair and deceptive trade practice." (FAC ¶ 174.) BAB also purports to base its Unfairness Claims on those allegations set forth in support of its fraud claims, as well as those "particularized throughout the complaint generally[.]" (FAC ¶ 163.)

69. In arguing for dismissal, Defendants assert that BAB's allegations in support of its Unfairness Claims are the same as those BAB advances in support of its fraud claims and that dismissal of the former is required to the extent the Court dismisses the latter. (Defs.' Supp. Br. 22.) BAB does not appear to dispute

Defendants' legal conclusion but does dispute that BAB's Unfairness Claims are confined to the allegations supporting its fraud-based claims.

70. The Court concludes that Defendants have the better of this argument. While BAB certainly incorporates into its Unfairness Claims all of the allegations of its First Amended Complaint, (FAC ¶ 163), the gravamen of those allegations, except as noted in the "reverse passing off" discussion that follows, are focused on Defendants' alleged fraudulent misrepresentations and alleged deceptive conduct, all of which BAB alleges was designed to conceal BAB's true intent to induce BAB to divulge its confidential business plan and model so that Defendants could use that information to compete against BAB in the marketplace. Those allegations sound in fraud and are the same as the allegations that BAB advances to support its fraud claims.

71. This Court has recognized that where, as here, "a section 75-1.1 claim is based on allegations of deceptive conduct, such allegations must be pleaded with particularity." *Regency Ctrs. Acquisition, LLC v. Crescent Acquisitions, LLC*, 2018 NCBC LEXIS 7, at *27 (N.C. Super. Ct. Jan. 24, 2018); *see also Hilco Transp., Inc. v. Atkins*, 2016 NCBC LEXIS 5, at *24 n.5 (N.C. Super. Ct. Jan. 15, 2016) (to similar effect); *Topshelf Mgmt., Inc. v. Campbell-Ewald Co.*, 117 F. Supp. 3d 722, 731 (M.D.N.C. 2015) ("Rule 9(b) applies to section 75-1.1 claims alleging detrimental reliance on false or deceptive representations."). Because the same analysis for UDTPA claims applies to claims for common law unfair competition, *see Global Textile*, 2018 NCBC LEXIS 159, at *33, the Court concludes that BAB's claim for

common law unfair competition—which is likewise based on allegations of deceptive conduct—must, too, be pleaded with particularity.

72. Accordingly, the Court agrees with Defendants that, to the extent BAB has failed to plead its fraud claim with particularity, BAB's Unfairness Claims necessarily fail to that same extent. Having concluded that BAB's fraud claims should be dismissed except to the extent those claims are based on the July 19 Call, the Court likewise concludes, again except as noted in the "reverse passing off" discussion below, that BAB's UDTPA and unfair competition claims should be dismissed with the same limitation.[9] *See, e.g.*, *Bhatti v. Buckland*, 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991) ("[A] plaintiff who proves fraud thereby establishes that unfair or deceptive acts have occurred."); *Hardy v. Toler*, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975) ("Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts[.]").

ii. BAB's Reverse Passing Off Claims

73. BAB alleges that Defendants have "falsely designated . . . as their own" the "origin of work" that BAB "originated" after "years of investment and development" and that Defendants' "false designation of origin and the use of BAB content is likely to deceive[,]" thereby violating state unfair competition law and both the Lanham Act and the UDTPA. (FAC ¶¶ 169, 182, 184, 186–89.)

74. Defendants contend that these claims—for reverse passing off—necessarily fail because BAB alleges only that Aeroflow *copied* BAB's product designs,

---

[9] Defendants do not challenge the adequacy of BAB's pleading as to any other specific element of BAB's section 75-1.1 claim.

descriptions, and size charts (which is permissible)—not that Aeroflow actually put its name on BAB products and sold them as Aeroflow or Motif products (which is impermissible). (Defs.' Supp. Br. 25 (citing FAC ¶¶ 99, 101, 179).) Defendants also seek dismissal on grounds that BAB has not alleged "allege actual harm resulting from consumer confusion." (Defs.' Supp. Br. 23.)

75. The Lanham Act provides, in relevant part, as follows:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the *origin*, sponsorship, or approval *of* his or her *goods*, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (emphasis added).

76. Passing off under the Lanham Act "occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003). Reverse passing off occurs when "[t]he producer misrepresents someone else's goods or services as his own." *Id.* Both acts are illegal under the Lanham Act. 15 U.S.C. § 1125(a)(1).

77. Similarly, North Carolina courts have held that "[t]he 'passing off' of one's goods as those of a competitor has long been regarded as unfair competition." *Harrington Mfg. Co. v. Powell Mfg. Co.*, 38 N.C. App. 393, 404, 248 S.E.2d 739, 746 (1978). Although the Court's research has not located a decision from our State's courts considering a claim for "reverse passing off," the Court concludes that, in light of *Harrington* and the Lanham Act's express prohibitions, the Supreme Court of North Carolina, if confronted with the issue, would likely conclude that reverse passing off likewise constitutes unlawful competition under North Carolina law.

78. A reverse passing off claim under the Lanham Act requires a plaintiff to prove:

> (1) that the work at issue originated with [the plaintiff]; (2) that origin of the work was falsely designated by [a defendant]; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that [the plaintiff was] harmed [or likely to be harmed] by [a defendant's] false designation of origin.

*Bon Aqua Int'l, Inc. v. Second Earth, Inc.*, No. 1:10CV169, 2013 U.S. Dist. LEXIS 11635, at *57 (M.D.N.C. Jan. 29, 2013) (citation omitted), *report and recomm. adopted by* 2013 U.S. Dist. LEXIS 203623 (M.D.N.C. Feb. 26, 2013).

79. The Court concludes that our Supreme Court would find these same requisite elements for a reverse passing off claim under North Carolina state law.

80. BAB alleges two types of purported "reverse passing off" misconduct by Defendants. First, BAB avers that it provided product designs and descriptions, sizing charts, and insurance billing information, among other information, to Aeroflow. (*See, e.g.*, FAC ¶ 178.) Thereafter, Motif, without BAB's knowledge or

consent, bought BAB products online through Amazon, took the products to factories in China and Taiwan for copying and production, and sold those copied products under the Motif label. (FAC ¶¶ 131–34, 139, 179.) BAB contends that this conduct constitutes "reverse passing off" and is a violation of state and federal law. Defendants disagree.

81. The Court agrees with Defendants. Rather than constitute unfair competition, the United States Supreme Court has held that creating "knockoff" products of the sort alleged here is not a violation of the Lanham Act. *See Wal-Mart Stores, Inc.* v. *Samara Bros., Inc.*, 529 U.S. 205, 207–08, 211, 214, 216 (2000) (rejecting Lanham Act protection for certain "knockoff" products); *Dastar*, 539 U.S. at 36 (holding that the Lanham Act does not "creat[e] a cause of action for, in effect, plagiarism—the use of otherwise unprotected works and inventions without attribution"); *see also, e.g.*, *Logan Developers, Inc. v. Heritage Bldgs., Inc.*, No. 7:12-CV-323, 2013 U.S. Dist. LEXIS 140909, at *7 (E.D.N.C. Sept. 30, 2013) (finding Lanham Act liability only if "defendant obtained physical goods from a plaintiff, repackaged the unaltered goods, and sold them under defendant's name").

82. Federal courts have concluded that protection against this conduct, if it is available at all, is through the federal Copyright Act, 17 U.S.C. § 101 *et seq.*, not the Lanham Act. *See, e.g.*, *Logan*, 2013 U.S. Dist. LEXIS 140909, at *9 (noting that plaintiff's remedy for design copying was "in copyright law, not trademark"). The Court sees no reason for the North Carolina courts to view this conduct any differently under the UDPTA or state unfair competition law. Accordingly, the Court

concludes that BAB's Reverse Passing Off Claims should be dismissed to the extent they are based on Defendants' alleged copying and subsequent sale of knockoff versions of BAB's products, designs, and other materials.

83. BAB alleges a second type of reverse passing off misconduct, however—alleged misconduct the Court concludes does state a violation of the requirements of the Lanham Act. In particular, BAB alleges that "[w]hatever BAB products Aeroflow had in its inventory at that time were sold under the Motif name, until such supplies were exhausted[,]" (FAC ¶ 156), and that this conduct was "likely to deceive as to the origin of the products and attendant commercial activities," (FAC ¶ 186), causing damage to BAB, (FAC ¶ 188). That alleged misconduct—Defendants' sale of BAB's products as if they were Defendants' own—runs afoul of both federal and state law. *See, e.g.*, *Edmondson v. Am. Motorcycle Ass'n, Inc.*, 7 Fed. App'x 136, 152 (4th Cir. 2001) (finding Lanham Act violation where competitor marketed and promoted races as if they were a continuation of the race series previously held by its joint venture with plaintiff); *Harrington*, 38 N.C. App. at 404–05, 248 S.E.2d at 746 (finding competitor's demonstration of party's product to potential customers as if it were competitor's product to constitute unfair competition under North Carolina law).

Accordingly, the Court concludes that BAB's Reverse Passing Off claims should survive dismissal to this extent.[10]

F.    Unjust Enrichment

84.    BAB asserts a claim against Defendants for unjust enrichment as an alternative to its joint venture claim. (FAC ¶ 273.) BAB alleges in support of that claim that BAB conferred an "enormous," non-gratuitous benefit upon Defendants, (FAC ¶ 275), which Defendants "readily accepted," (FAC ¶ 275), in the form of BAB's valuable business plan, model, "services, materials and interests[,]" (FAC ¶¶ 275, 278–79), which enabled Defendants to secure BAB's profits, (FAC ¶ 281), and market share, (FAC ¶ 282).

85.    "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Krawiec*, 370 N.C. at 615, 811 S.E.2d at 551–52 (quoting *Atl. Coast Line R.R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95–96, 150 S.E.2d 70, 73 (1966)). To establish a claim for unjust enrichment, "a party must prove that it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Se. Shelter Corp.*, 154 N.C. App. at 330, 572 S.E.2d at 206; *see also Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988) ("The benefit must

---

[10] The Court rejects as a basis for dismissal at this stage Defendants' contention that BAB has failed to allege "actual harm resulting from consumer confusion." (Defs.' Supp. Br. 23.) Viewing the First Amended Complaint in the light most favorable to BAB, the Court concludes that BAB has met its pleading burden on this element.

not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances.").

86. Defendants seek dismissal of BAB's unjust enrichment claim, contending that anything BAB provided to Aeroflow beyond the product Aeroflow purchased was gratuitous and that BAB failed to allege "that Aeroflow did anything wrongful to induce BAB's provision of these services." (Defs.' Supp. Br. 27.) The Court finds both arguments without merit.

87. First, Defendants' contention that "Aeroflow received only what it paid for—BAB's finished product, ready for retail sale[,]" (Defs.' Reply Br. 12), may prove true as a matter of evidence but is not admitted by BAB's allegations. To the contrary, BAB alleges at length that it provided Defendants its confidential business plan and its component parts, which Defendants accepted and used to compete against BAB. (FAC ¶¶ 66, 70–72, 74–75, 119–20, 126–28, 147, 170, 178, 194.) Although Defendants argue that BAB's business plan is not a trade secret and thus had no value to Defendants, *see RLM Commc'ns, Inc. v. Tuschen*, 66 F. Supp. 3d 681, 702 (E.D.N.C. 2014), *aff'd*, 831 F.3d 190 (4th Cir. 2016) (holding no measurable and non-gratuitous benefit conferred by alleged trade secret when court dismissed trade secret claim), the Court has denied Defendants' motion to dismiss BAB's trade secret claim, eliminating this line of argument on this Motion. Moreover, these same allegations show, contrary to Defendants' contention, that Defendants induced BAB to provide

these benefits through alleged fraudulent misrepresentations and other allegedly deceptive conduct. (*See* FAC ¶¶ 86, 136.)

88. Accordingly, the Court concludes that Defendants' Motion to dismiss BAB's unjust enrichment claim should be denied.

G.    Punitive Damages and Attorneys' Fees

89. BAB seeks punitive damages based on its fraud claims, (FAC ¶ 287), and reasonable attorneys' fees based on its UDTPA claim, (FAC ¶ 289). Defendants seek dismissal of each request for relief on grounds that the fraud and UDTPA claims should be dismissed. (Defs.' Supp. Br. 27.) Because the Court has declined to dismiss either of these underlying claims in their entirety, however, Defendants' Motion as to these requests for relief must be denied.

IV.

CONCLUSION

90. **WHEREFORE**, the Court, for the reasons stated herein, hereby **GRANTS in part** and **DENIES in part** the Motion as follows:

> i.    The Court **GRANTS** the Motion as to BAB's claims for joint venture and constructive fraud, and those claims are hereby dismissed with prejudice.

> ii.    The Court **DENIES** the Motion as to BAB's claims for breach of the duty of good faith and fair dealing, trade secret misappropriation, and unjust enrichment, and those claims shall proceed to discovery.

iii.	The Court **GRANTS** the Motion as to BAB's claims for fraud and fraudulent concealment, except to the extent those claims are based on BAB's allegations in connection with and arising from the July 19 Call, and to that extent, the Court **DENIES** the Motion. Except as provided in this subparagraph, the Court dismisses the fraud and fraudulent concealment claims with prejudice, and orders that to the extent the claims are not dismissed, they shall proceed to discovery.

iv.	The Court **GRANTS** the Motion as to BAB's claims for common law unfair competition and violation of the UDTPA and the Lanham Act, except to the extent those claims are based on BAB's allegations that Defendants sold BAB's products as if they were Defendants' own, and to that extent, the Court **DENIES** the Motion. Except as provided in this subparagraph, the Court dismisses these claims with prejudice and orders that to the extent the claims are not dismissed, they shall proceed to discovery.

v.	The Court **DENIES** the Motion as to BAB's request for punitive damages and for attorneys' fees under the UDTPA.

**SO ORDERED**, this the 4th day of November, 2020.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge